Rickey GILLESPIE and Ghislaine Gillespie, Plaintiffs and Appellants,

v.

SOUTHERN UTAH STATE COLLEGE, a public corporation, Defendant and Respondent,

v.

Scott L. BROWN, M.D., Third-Party Defendant and Respondent.

No. 17850.

Supreme Court of Utah.

Aug. 25, 1983.

---

H. Wayne Wadsworth, Salt Lake City, Gerald J. Bloch, Milwaukee, Wis., for plaintiffs and appellants.

Roger H. Bullock and Gary D. Stott, Salt Lake City, for defendant and respondent.

DURHAM, Justice:

This is an action to recover damages for personal injuries to the plaintiff Rickey Gillespie and for emotional injuries to, and loss of educational and employment opportunities by, the plaintiff Ghislaine Gillespie, Rickey's wife. At the conclusion of the plaintiffs' case, the trial court dismissed Ghislaine's cause of action. In addition, after the entry of the jury's special verdict finding that the defendant Southern Utah State College (hereafter "College") was not negligent, the trial court also dismissed Rickey's cause of action. We affirm.

Rickey was attending the College on a basketball scholarship for the 1977–78

school year. On January 4, 1978, Rickey sprained his ankle in a practice scrimmage. The basketball coach turned the treatment of Rickey's injury over to David Slack, a student trainer for the College. The treatment applied by Mr. Slack consisted of spraying the ankle with a tape adherent, applying a pre-wrap to prevent the tape from coming into contact with the skin, and then taping it.

After taping the ankle, Mr. Slack instructed Rickey to immerse his ankle in a bucket of ice water for ten to fifteen minutes, then to remove it and walk on it for three to five minutes, and to repeat this cycle two to three more times. Rickey followed this procedure for the remainder of the practice scrimmage and then continued it for two hours at home. Later that evening, Mr. Slack brought a bag of ice to Rickey's apartment, helped Rickey into bed, elevated his foot, and put the bag of ice on his ankle. The ice lasted approximately two hours.

On January 5, 1978, the morning after the injury, Mr. Slack made arrangements for Rickey to see the third-party defendant Dr. Scott L. Brown that afternoon. Dr. Brown noted in passing that due to the swelling the tape was difficult to remove. Dr. Brown took an x-ray of Rickey's ankle which revealed that it was not fractured, only sprained. Upon inquiry regarding the treatment that Mr. Slack had prescribed for Rickey's ankle, Mr. Slack replied that he had been "icing" it. Dr. Brown assumed tht "icing" meant applying ice packs. Dr. Brown instructed Rickey and Mr. Slack to continue wrapping and "icing" Rickey's ankle for a period not to exceed 72 hours from the time of injury and prescribed codeine for pain.

After leaving Dr. Brown's office, Rickey and Mr. Slack went to the training room where Rickey's ankle was retaped with a pressure bandage to allow for swelling and the ice water immersion treatments were continued. That evening, Mr. Slack brought a bag of ice to Rickey's apartment and told Rickey to continue the ice water immersion treatments. There was testimony indicating that Rickey slept that night with his ankle submerged in a bucket of ice water.

On the evening of January 6, 1978, two days after the injury, Rickey sat on the bench and periodically immersed his foot in ice water during the first and second halves of the basketball game. After the game, he continued the ice water immersion treatments at home. On the evening of January 7, 1978, Rickey again periodically immersed his foot in ice water during the first and second halves of the basketball game. Rickey did not recall any treatment after the game. On January 8, 1978, Rickey may have used the ice treatments during the day.

Late in the afternoon on January 9, 1978, the basketball coach and/or Mr. Slack started Rickey on warm whirlpool treatments. That evening, Mr. Slack visited Rickey at his home and found him using the ice water immersion treatment because Rickey said that it made his foot feel better. Mr. Slack immediately called Dr. Brown, who instructed Mr. Slack to stop the ice water treatment, to wrap Rickey's foot with Atomic Balm, which created heat, and to have Rickey sleep with his foot elevated.

On the morning of January 10, 1978, six days after the injury, Rickey visited Dr. Brown, who sent Rickey to the Valley View Hospital to be admitted and treated for the injury to his foot. Rickey was diagnosed as suffering from thrombo phlebitis and as having apparent frostbite of the fourth and fifth toes along with smaller areas on the bottom of his foot and heel. On January 23, 1978, Rickey was discharged from the Valley View Hospital for further treatments at a hospital nearer to his home in Milwaukee, Wisconsin. Dr. Rydlewicz, who treated Rickey in Milwaukee, rated Rickey's right lower extremity as being ninety percent disabled due to amputation of a gangrenous toe, removal of some tissue and muscle of the right foot, and osteomyelitis of the right foot. During his testimony at trial, Dr. Rydlewicz also expressed his concern as to whether Rickey's foot could be saved because of the osteomyelitis, and said

that a below the knee amputation may be necessary at some future time.

On March 2, 1979, Rickey and Ghislaine filed suit against the College claiming that the basketball coach and Mr. Slack were negligent in their treatment of Rickey's injury. On August 14, 1979, the College filed a third-party complaint against Dr. Brown. At trial, at the conclusion of the plaintiffs' case, the trial court dismissed Ghislaine's cause of action. The jury subsequently returned a special verdict in which it found that: (1) Rickey was 100% negligent and such negligence was the proximate cause of his injuries, and (2) the College and Dr. Brown were not negligent. Based on the jury's special verdict, the trial court also dismissed Rickey's cause of action.

On appeal, Rickey claims that the jury verdict should be set aside because the jury's finding of no negligence by the College was contrary to the evidence and an abuse of the jury's deliberative process. Rickey also claims that the trial court erred in the instruction that it gave to the jury regarding the standard of care for an athletic trainer. Ghislaine claims that the trial court erred in dismissing her cause of action.

With respect to Rickey's first claim of error, this Court has recently set forth the applicable standard of review as follows:

It is the exclusive province of the jury to determine the credibility of the witnesses, weigh the evidence, and make findings of fact. Where the evidence is conflicting and the jury is properly instructed, we do not upset those findings of fact on appeal except upon a showing that the evidence, viewed in the light most favorable to the verdict, so clearly preponderated in appellant's favor that reasonable persons could not differ on the outcome of the case.

*Groen v. Tri-O-Inc.,* Utah, 667 P.2d 598 at 601 (1983) (citations omitted). *See also, e.g., E.A. Strout Western Realty Agency, Inc. v. W.C. Foy & Sons, Inc.,* Utah, 665 P.2d 1320 (1983); *White v. Fox,* Utah, 665 P.2d 1297 (1983).

Rickey contends that the jury's verdict that the College was not negligent is contrary to the uncontroverted evidence and therefore should be set aside. Rickey claims that the evidence is uncontroverted that Mr. Slack's taping of Rickey's ankle on January 4, 1978, which did not allow for swelling, was negligent. If the evidence were uncontroverted, Rickey's assertion would merit consideration. However, the evidence was not uncontroverted. While some of the physicians and trainers that testified at trial stated that Mr. Slack's tight taping of Rickey's ankle *might,* in conjunction with the ice immersion treatments and the failure to elevate the ankle, have contributed to Rickey's injuries, there was other testimony to the contrary. Although Dr. Brown agreed with the above general statements by the other physicians and trainers, he testified on redirect examination that Mr. Slack's tight taping did not play any part in Rickey's injury:

Q: So the fact that that tape may have been too tight on Thursday [January 5th]; at this point in time, that certainly would not account for the problem that you saw on [January] 10th, would it?

A: No, It wouldn't.

. . . .

Q: But do you feel that the taping situation that you found on the afternoon of January 5th, 1978 played any part in the injury that we have here today?

A: No. I don't.

The testimony of the other physicians and trainers was based on hypothetical questions. They did not personally examine the tightness of the taping of Rickey's ankle. Dr. Brown, on the other hand, personally examined and removed the taping. We acknowledge the personal tragedy suffered by the plaintiffs, but we are constrained to recognize that the jury was free to find Dr. Brown's testimony more credible and base its findings thereon. Thus, viewing the evidence in a light most favorable to the jury's verdict, we will not upset the jury's verdict because the evidence does not so clearly preponderate in Rickey's favor

that reasonable persons could not differ on the outcome of the case.

 Rickey also claims that the trial court erred in the instruction that it gave to the jury regarding the standard of care required of an athletic trainer. The instruction given is virtually identical to that contained in J. Crockett, *Jury Instruction Forms for Utah* No. 50.3, at 130–31 (1957) (captioned "Limitation Upon Duty Owed By Physician to Patient"). Rickey's argument is that the instruction was improper because: (1) Mr. Slack is not a physician nor a professional, and (2) by providing treatment to an injury that would have healed by itself if left alone, Mr. Slack became a "guarantor" of good results. These arguments are without merit. Even if the giving of the instruction was error, it was harmless in this case because it held Mr. Slack to the *higher* standard of care that governs physicians and surgeons rather than the lower standard that may be applicable to laymen or athletic trainers. Furthermore, the second argument cannot prevail because it would mean that anyone, including physicians and surgeons, who treated an ordinary sprained ankle or another injury that would heal by itself if left unattended would be "strictly" liable without fault for any adverse consequences resulting from the treatment. No authority has been cited, nor has our research revealed any, that supports such an extension of tort law. Thus, the trial court did not err in giving the instruction regarding an athletic trainer's standard of care.[1]

On appeal, Ghislaine claims that the trial court erred in dismissing her cause of action. The trial court did so at the conclusion of the plaintiffs' evidence on the ground that Utah does not recognize a cause of action for loss of consortium. *See, e.g., Ellis v. Hathaway,* 27 Utah 2d 143, 493 P.2d 985 (1972); *Corbridge v. M. Morrin & Son, Inc.,* 19 Utah 2d 409, 432 P.2d 41 (1967). Ghislaine contends that her cause

of action is for an independent tort and not for loss of consortium. Even if this contention is correct, the jury's finding of no negligence by the College would have barred her recovery on a cause of action based on negligence. Therefore, we do not address the merits of Ghislaine's claim of error because, even if error, the trial court's dismissal of her cause was harmless.

Affirmed. No costs awarded.

HALL, C.J., and HOWE and STEWART, JJ., concur.

OAKS, J., does not participate herein.

---

1. We also note that when all of the instructions to the jury are construed together and viewed as a whole, the plaintiff's case was not prejudiced. *See, e.g., Rowley v. Graven Brothers & Co.,* 26 Utah 2d 448, 491 P.2d 1209 (1971); *Simpson v. General Motors Corp.,* 24 Utah 2d 301, 470 P.2d 399 (1970); *Walkenhorst v. Kesler,* 92 Utah 312, 67 P.2d 654 (1937).